# In the United States Court of Federal Claims

No. 25-1700
Filed: November 13, 2025
Re-issued: November 20, 2025[1]

|  |  |
|---|---|
| TRIBAL HEALTH, LLC, | ) |
| *Plaintiff*, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| *Defendant*, | ) |
| and | ) |
| PRIME PHYSICIANS, PLLC, | ) |
| *Defendant-Intervenor*. | ) |

**OPINION AND ORDER**

  Pursuant to a task order, Tribal Health, LLC has been providing the staffing to manage and operate the emergency department at Rosebud Hospital, a rural hospital in Rosebud, South Dakota. Tribal Health's task order expired on September 30, 2025. In its place, the Indian Health Service ("IHS") issued a task order to Prime Physicians, PLLC, with staffing to begin October 1, 2025. Unhappy with the award to Prime, Tribal Health protested the task order award at the Government Accountability Office ("GAO"). The merits of that protest are not before the court.

  Rather, Tribal Health alleges that IHS has violated the automatic stay provisions of the Competition in Contracting Act ("CICA"), including through the ongoing performance of a short-term bridge task order that IHS issued under a different contract. When a disappointed bidder files a timely protest at the GAO, CICA generally prohibits performance of "the contract" until the GAO issues its final decision. 31 U.S.C. § 3553(d)(3). If the agency chooses, however, it may issue written findings that statutory criteria are met that allow performance during the

---

[1] The court initially filed this Opinion and Order under seal to allow the Parties to propose redactions. The Parties submitted no proposed redactions, ECF No. 44. Therefore, the court is reissuing the Opinion and Order with no redactions.

GAO protest.  These are typically known as "CICA Override" cases.  In this one, Tribal Health seeks preliminary injunctive relief to stop performance of the bridge task order immediately.

Tribal Health alleges three distinct violations of CICA's automatic stay.  First, Tribal Health alleges that Prime Physicians was performing the contract after Tribal Health filed its GAO protest on August 8, 2025.  According to Tribal Health, Prime Physicians' personnel were going to Rosebud Hospital and performing when they engaged in the credentialling process—i.e., getting permission from the hospital to practice in the emergency department.  Although it is not clear that such credentialling is performance, Count I addressing this alleged performance is specifically limited to conduct before September 30, 2025.  And before Tribal Health filed its complaint, the Government issued a stop work order on the protested task order, ending any such performance.  Because there is no allegation that this credentialling is continuing or reasonably likely to resume, there is nothing an injunction can do to redress this harm.

Second, Tribal Health asserts that IHS's CICA Override determination and findings were arbitrary and capricious.  Although IHS initially sought to override the CICA stay, this argument too has been overtaken by events.  Even assuming Tribal Health is correct that the override justification was arbitrary and capricious, the stop work order that IHS issued a week after the override justification (but before the complaint was filed in this case) provided all the relief that this court could order.  Again, without any allegation that the Government was continuing to rely on the CICA Override determination or may reasonably be expected to do so again, there is nothing an injunction could redress.  In other words, the stop work order is as much relief as this court could award to redress this harm, and it is already in place.

Third, Tribal Health asserts that IHS's bridge task order to an affiliate of Prime Physicians is a de facto override—i.e., is violating CICA's stay of performance.  The court does have jurisdiction over this claim, which is distinct from the claim that the CICA Override determination was arbitrary and capricious.  But because Tribal Health has not carried its burden to justify the preliminary injunctive relief that it seeks, the court denies its motion for a preliminary injunction.

I.   **Background**

Because this opinion resolves a motion to dismiss, the court accepts "all well-pleaded factual allegations as true and draws all reasonable inferences in [Tribal Health's] favor" when resolving the motion.  *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000).

Before turning to the background, the court recognizes that there are multiple solicitations, contracts, and task orders at issue in this protest.  At the outset, the court provides a color-coded graphical overview to help the reader keep track of these various documents.  The documents in black are those relating to Tribal Health's now-expired incumbent task order.  The documents in red relate to Prime Physician's protested task order.  And the documents in green relate to the bridge task order currently in place to provide staffing to Rosebud Hospital's emergency department.  The roles of these documents and players will become clear shortly.



ECF No. 31 at 5.[2]  The court now turns to the factual background of this action.

Rosebud Hospital provides healthcare to around 130,000 Native Americans in the Great Plains Area of southern South Dakota; the next closest emergency department is over 100 miles away.  ECF No. 1 ¶ 4, Ex. C at 3.[3]  IHS initially sought staffing for the emergency department at Rosebud through Solicitation No. 75H70624R00001.  *Id*. ¶ 18.  That solicitation resulted in two Indefinite-Delivery, Indefinite-Quantity ("IDIQ") contract awards, one to Tribal Health (Contract No. 75H70624D00005) and one to Prime Physicians (Contract No. 75H70624D00004).  *Id*. ¶¶ 16-19.  IHS awarded these contracts to provide emergency department management and staffing to rural hospitals in the Great Plains Area because "[t]here is a critical need for emergency department [] patient care services within the Great Plains Area." *Id*. ¶ 26, Ex. C at 3.  As a result, only Tribal Health and Prime Physicians are eligible to submit proposals for task orders to provide these services.  *Id*. ¶¶ 11, 29.  The IDIQ contracts stipulate that issued task orders are to be one year in length, with four, one-year option periods.  *Id*. ¶ 27, Ex. A at 74.  Contract holders must be able to provide Rosebud Hospital with Emergency Department Directors, Emergency Department Physicians, Advanced Practice Providers, Physician Assistants, Emergency Department Nurse Supervisors, Registered Nurses, and Medical Support Assistants to fulfill the task order.  *Id*. ¶ 28, Ex. A at 32.  And these contracts limit the amount that each contractor could earn at each facility during each option period.  *See*

---

[2] This chart identifies the IDIQ contracts incorrectly; the contract numbers are missing a zero after the "D" in the contract number—i.e., the contract numbers are 75H70624D00005, 75H70624D00004, and 75H71125D00003.

[3] Because ECF No. 1, Exhibit C is not consecutively paginated, the court refers to the page numbering in the ECF header.

ECF No. 20-1 at 3-4.[4]  For example, Tribal Health could perform work at Rosebud Hospital between July 1, 2025, and June 30, 2026, totaling up to $12,081,507.56. *Id*. at 4.

From July 1, 2024, through September 30, 2025, Tribal Health staffed the emergency department at Rosebud Hospital under Task Order No. 75H70624F03002. ECF No. 1 ¶¶ 19, 30-34. When considering a new task order for emergency department services after September 30, IHS determined that Tribal Health lacked the contractual capacity to perform the services needed, whereas Prime Physicians had the capacity. *Id*., Ex. C at 5; *see also* ECF No. 20-1 at 4. Recognizing this, on July 31, 2025, IHS awarded a sole source task order to Prime Physicians to staff the emergency department at Rosebud Hospital, Task Order No. 75H70625F03006. ECF No. 1 ¶¶ 16, 34. Tribal timely protested this task order award at the GAO, triggering CICA's automatic stay provision, 31 U.S.C. § 3553(d)(3).

While the protest was pending before the GAO, Tribal Health complained that Prime Physicians was performing the protested task order through—at minimum—engaging in the credentialling process with Rosebud Hospital. *See* ECF No. 1, Count I. IHS then issued the required determination and finding necessary to override the CICA stay effective October 1, 2025. *See id*., Count II. IHS, however, has abandoned that override. On October 8, 2025, IHS issued a stop work order on Prime Physicians' task order. ECF No. 31-1. IHS has turned to another source to obtain the required staffing for the Rosebud emergency department during the GAO protest.

On October 7, 2025, the Government and Prime Physicians TRI Providers LLC ("Prime TRI")[5] modified another IDIQ contract—Contract No. 75H71125D00003. ECF No. 1 ¶ 41; *see also* ECF No. 37-1.[6] Prior to this modification, this contract was to provide medical services in parts of Oklahoma and Kansas. ECF No. 35-1 at Appx 11-12; *see also* ECF No. 37-1 at Appx 18-19. After the modification, Prime TRI can provide services to any IHS hospital, including Rosebud. ECF No. 37-1 at Appx 13-18. Pursuant to this amended contract, IHS issued Prime TRI a bridge task order, Task Order No. 75H70626F03001. This task order covers staffing Rosebud's emergency department until November 20, 2025, with two thirty-day options available, for a total of 100 days of performance. ECF No. 1 at ¶ 71; ECF No. 37-1 at Appx 49-53. This bridge task order has raised Tribal Health's hackles because Prime TRI is a mentor-protégé joint venture consisting of Prime Physicians and Tribal Providers PLLC, an Indian-owned small business. ECF No. 1 ¶ 42; ECF No. 32-1 at A1 ¶ 3. Tribal Health considers the

---

[4] Because ECF No. 20-1 is not consecutively paginated, the court refers to the page numbering in the ECF header.

[5] The parties spend some effort disputing whether Wellpath Medical LLC is doing business as, or changed its name to, Prime Physicians TRI Providers LLC. The court fails to see how that distinction makes a difference to any of the issues presently before it, and both names appear on Contract No. 75H71125D00003. ECF No. 37-1 at Appx 1. Because the parties generally refer to this contracting entity as Prime TRI, the court does so as well.

[6] ECF No. 37-1 contains a declaration, the amended Oklahoma City contract, and the bridge task order. The "Appx" pagination only applies to the amended contract and bridge task order and begins on page 3 of the ECF Header pagination. Citations to ECF No. 37-1 that include a paragraph reference refer to the declaration contained in the first two pages of the exhibit.

award to Prime TRI as effectively an award to Prime Physicians, therefore amounting to a de facto override of the CICA stay.  ECF No. 1, Count III.

Tribal Health now moves for a preliminary injunction to bar performance by Prime Physicians or any of its affiliates, including Prime TRI, while this protest plays out.  The Government and Prime Physicians move to dismiss for lack of subject matter jurisdiction, and they both oppose any injunctive relief.

## II.     Standard of Review

This court reviews jurisdictional challenges under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims.  "A motion to dismiss for lack of standing pursuant to RCFC 12(b)(1) questions whether the court has jurisdiction to adjudicate the merits of the underlying dispute."  *BCG Fed. Corp. v. United States*, 172 Fed. Cl. 543, 551 (2024) (citations omitted).  "When the court addresses a 'facial' challenge to the complaint based on subject matter jurisdiction, . . . the court must assume that the facts alleged in the complaint are true and correct."  *CW Gov't Travel, Inc. v. United States*, 46 Fed. Cl. 554, 556 (2000).  As plaintiff, Tribal Health bears the burden of establishing this court's jurisdiction.

## III.    Jurisdiction

"Subject matter jurisdiction is a threshold issue that must be determined at the outset of a case."  *King v. United States*, 81 Fed. Cl. 766, 768 (2008) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1365 (Fed. Cir. 2007).  This court has jurisdiction to hear claims by an "interested party" alleging a "violation of statute or regulation in connection with a procurement or proposed procurement."  28 U.S.C. § 1491(b)(1).  Here, Tribal Health alleges the violation of CICA's automatic stay provisions, which satisfies Section 1491(b)(1).  *See RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1290 (Fed. Cir. 1999*); see also Starside Sec. & Investigation, Inc. v. United States*, 177 Fed. Cl. 28, 33 (2025).

But "[i]n addition to general jurisdictional considerations, a plaintiff's claim also must be justiciable."  *Brocade Commc'ns Sys., Inc. v. United States*, 120 Fed. Cl. 73, 76 (2015).  "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."  *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  Thus, a case must present a live "case or controversy" for the court to have jurisdiction to hear it.  U.S. Const. Art. III, § 2, cl. 1; *see Burke v. Barnes*, 479 U.S. 361, 363 (1987).  Although an Article I court, this court applies Article III's justiciability limitations.  *Brocade Commc'ns Sys., Inc.*, 120 Fed. Cl. at 76 ("It is now settled that the justiciability doctrines apply fully to this Article I court[].").

The Government contends that Counts I and II are now moot because IHS has issued the stop work order and abandoned the CICA Override, and that the court lacks jurisdiction over Count III because there is no longer a CICA Override for the court to review.  For its part, Prime Physicians argues that Tribal Health lacks standing to bring Counts I and II because there is no

5

redress that this court may grant, and that the court lacks jurisdiction over Count III because it involves the award of a task order.

### A. Because Counts I and II address past conduct without any indication of continuing violation, Tribal Health lacks standing.

Before turning to the specifics of the jurisdictional challenges, the court first addresses the proper framework to consider the challenges to Counts I and II—whether this case presents a standing question or a mootness question. These doctrines are related insofar as both look to whether the court may provide meaningful relief to a plaintiff, "but the two inquiries differ in respects critical to the proper resolution of this case." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). These differences include the period the court considers, which party has the burden of proof, and what that party must prove. The distinctions matter in this case. For example, if the Government were correct that Counts I and II are moot, the Government would "bear[] the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 190. But the Government's brief makes no attempt to carry this burden; it merely declares Counts I and II moot and moves on.

This case presents a standing question rather than a mootness question. The court analyzes standing as of the filing of the complaint, while mootness analyzes whether something has happened since the filing of the complaint that results in the plaintiff lacking a personal stake in the outcome of the case. As the Supreme Court explained, "[t]he doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 282 (2021); *see also Friends of the Earth, Inc*, 528 U.S. at 189 ("[T]he doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'") (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997)) (additional citations omitted). Thus, the first question for the court is whether Tribal Health has established its standing to bring Counts I and II.

"The 'irreducible constitutional minimum of standing' contains three requirements." *Steel Co.*, 523 U.S. at 102 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). These are (1) a "concrete and particularized" injury-in-fact that is "actual or imminent"; (2) "a causal connection between the injury and the conduct complained of"; and (3) likely "to be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61. Importantly, "a plaintiff's burden extends to 'demonstrating that it has standing for *each* claim.'" *BCG Fed. Corp.*, 172 Fed. Cl. at 551 (quoting *Owl Creek Asia I, L.P. v. United States*, 148 Fed. Cl. 614, 641 (2020)) (additional citations omitted) (emphasis added).

At issue here is redressability. An alleged injury is redressable if it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1996)). But if "after the undoing of the government action the status quo remains in place, the alleged injury is not redressable." *Acuity Edge, Inc. v. United States*, 174 Fed. Cl. 46, 54 (2024).

Therefore, if the injury is not redressable, Tribal Health lacks standing to bring it and this court cannot hear it.

In Count I, Tribal Health alleges that Prime Physicians violated the CICA stay of performance *before* September 30, 2025. ECF No. 1 ¶¶ 51-53. By its own terms, Count I alleges only past conduct. But Count I says nothing about continuing violations or suggest that the alleged harm—Prime Physicians' performance of the protested task order by credentialling its personnel—is likely to resume. But to establish standing for injunctive relief, which is the only remedy Tribal Health seeks in this case, Tribal Health had to show that the alleged violations are continuing or the imminence of future violation. *E.g.*, *Steel Co*, 523 U.S. at 108 ("If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm."). By the time Tribal Health filed its complaint, IHS had issued the stop work order on the protested task order, ECF No. 31-1, reinforcing that there was no likely future violation by the time Tribal Health filed the complaint. Because Count I deals with past conduct—occurring before September 30, 2025—without any allegation that conduct would likely resume, Tribal Health fails to establish its standing to bring Count I.

In Count II, Tribal Health alleges that the CICA Override justification was arbitrary and capricious. ECF No. 1 ¶¶ 54-68. Tribal Health asserts that "the Agency failed to consider important aspects of the problem before it [when overriding the CICA stay], and, moreover, offered explanations for its decision that are unsupported and run counter to the evidence before the agency." *Id.* ¶ 54. Assuming that to be true, by the time Tribal Health filed its complaint there appears nothing this court could do to redress the alleged harm. The court must consider what the situation was at the time Tribal Health filed its complaint. In summary,

- On July 31, 2025, IHS awarded a sole source task order to Prime Physicians to staff the emergency department at Rosebud Hospital, Task Order No. 75H70625F03006. ECF No. 1 ¶¶ 16, 34.

- On August 8, 2025, Tribal Health filed its GAO protest, triggering CICA's automatic stay provisions. ECF No. 20-1 at 4.

- On September 30, 2025, IHS's head of contracting activity issued the required determination and findings to continue performance—the CICA stay override decision. ECF No. 1, Ex. C.

- On October 7, 2025, Prime TRI and IHS amended their contract issued by the Oklahoma City Area Office, No. 75H71125D00003, to allow performance at Rosebud Hospital and other IHS facilities. ECF No. 37-1 at Appx 1-53.

- On October 8, 2025, IHS issued the bridge task order to Prime TRI, task order 75H70626F03001. ECF No. 1, Ex. D. Also on that date, IHS issued the stop work order for the protested task order. ECF No. 31-1.

- On October 9, 2025, Tribal Health filed its complaint. ECF No. 1.

7

Thus, by the time Tribal Health filed its complaint, the Government had abandoned the CICA Override, issued the stop work order, and issued the bridge task order under a different contract. In Count II, Tribal Health alleges that the CICA Override was arbitrary and capricious. But "[r]edressability requires a showing 'that prospective relief will remove the harm . . . . Therefore, a plaintiff must show that it 'would benefit in a tangible way from the court's intervention.'" *Acuity Edge, Inc.*, 174 Fed. Cl. at 54 (quoting *Warth v. Seldin*, 422 U.S. 490, 505, 508 (1975)). If the court holds the CICA Override arbitrary and capricious, that will do nothing for Tribal Health because IHS is now procuring the required services through a bridge task order awarded under a different IDIQ contract. In other words, IHS has not relied on the CICA Override since October 8, 2025, when it issued the bridge task order to Prime TRI and issued the stop work order to Prime Physicians.

And there is another redressability problem for Count II. The result of a finding that the CICA Override was arbitrary and capricious would be to order the CICA stay to go back into effect. CICA requires the contracting officer to "immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." 31 U.S.C. § 3553(d)(3)(A)(ii). But by the time Tribal Health filed its complaint, the contracting officer had done that. ECF No. 31-1. There is nothing more this court can order based on an arbitrary and capricious CICA Override justification.

Nor does it matter that IHS could hypothetically revoke the stop work order without any allegation that IHS is reasonably likely to do so. Indeed, the Supreme Court expressly rejected an attempt to extend the presumption of future harm when the defendant voluntarily ceases challenged conduct from the mootness inquiry into the standing inquiry. "It is an immense and unacceptable stretch to call the presumption into service as a substitute for the allegation of present or threatened injury upon which initial standing must be based." *Steel Co*, 523 U.S. at 109. Because there is no redressable injury based on the CICA Override justification, Tribal Health has failed to establish its standing to bring Count II.

Accordingly, the court grants-in-part the Government's and Defendant-Intervenor's motions to dismiss insofar as they seek to dismiss Counts I and II.

**B.    This court has jurisdiction over Count III.**

The Government and Prime Physicians also move to dismiss Count III, which alleges that IHS's bridge task order violates CICA's automatic stay, on jurisdictional grounds. These arguments fail.

According to the Government, the fact that the court lacks jurisdiction over Counts I and II "also means that the [c]ourt lacks jurisdiction to hear Tribal Health's third count, that IHS is currently obtaining the services through a different entity under a separate contract vehicle that is not the subject of the GAO protest." ECF No. 31 at 8. At this stage, the court's jurisdiction to hear a de facto override claim is clear. *E.g.*, *Access Sys., Inc. v. United States*, 84 Fed. Cl. 241 (2008). It is a claim that the Government is violating a procurement statute—CICA—in

8

connection with a procurement, which fits squarely within this court's jurisdiction.  28 U.S.C. § 1491(b)(1).

Prime Physicians' argument regarding Count III is different.  It argues that the Federal Acquisition Streamlining Act ("FASA") bars jurisdiction.  ECF No. 32 at 7-11.  FASA's "task order bar" strips this court of jurisdiction to hear protests "in connection with the issuance or proposed issuance of a task or delivery order[.]"  41 U.S.C. § 4106(f)(1).  Prime Physicians acknowledges that this court has jurisdiction over CICA Override cases involving task orders because those cases concern whether the CICA Override decision, rather than the task order award, violate a statute in connection with a protest under 28 U.S.C. § 1491(b)(1).  *Id.* at 8.  Since IHS issued the stop work order, so the argument goes, the only thing left for the court to review is the lawfulness of the task order award, which FASA bars.  *Id.* at 10.

While it is not clear that FASA bars a de facto override claim involving a task order issued as a bridge contract, the court need not resolve that question.  FASA includes an exception that allows this court to hear "a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued[.]"  41 U.S.C. § 4106(f)(1)(A).  Tribal Health argues that the Oklahoma City IDIQ does not cover certain positions that are critical to the operation of the Rosebud emergency department, including Registered Nurses and Medical Support Assistants.  ECF No. 35 at 2-3.  Indeed, the thrust of Tribal Health's argument is that the Oklahoma City statement of work ("SOW") does not cover much of what Rosebud requires in its emergency department, meaning that Prime TRI is effectively performing the Rosebud SOW.  This fits within FASA's increasing-the-scope exception and allows the court to hear Count III.  Even if FASA would otherwise prohibit this court from hearing a de facto CICA Override claim, Tribal Health's allegation that the bridge task order at issue increases the scope of the IDIQ contract under which it was issued suffices to remove this case from the FASA jurisdiction bar.  If, however, the complete record (which is not yet before the court) ultimately shows that Tribal Health is wrong, that would mean its claim fails, not that this court lacks jurisdiction.  *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1341 (Fed. Cir. 2021).[7]

## IV.    Injunctive Relief

Tribal Health moved for a temporary restraining order and preliminary injunction, ECF No. 20, and then filed a supplemental motion based on information learned after the initial motion, ECF No. 27.  "The granting of a temporary restraining order 'is an extraordinary and drastic remedy,' as is the granting of a preliminary injunction."  *Safeguard Base Operations, LLC v. United States*, 140 Fed. Cl. 670, 686 (2018) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (cleaned up).  Such remedies "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek*, 520 U.S. at 972.  To determine whether to grant a preliminary injunction, the court considers the "(1) likelihood of success on

---

[7] During argument, the Government noted that the Oklahoma City contract is set aside for Indian-owned small businesses, and that Tribal Health is not a small business.  True enough.  ECF No. 37-1 at Appx. 47 (incorporating 48 C.F.R. § 352.226-4).  That was not briefed, however, and given the unique circumstances of this CICA override, the court is not prepared, without briefing, to say that the set-aside of the Oklahoma City contract prevents Tribal Health from arguing that IHS is violating CICA with the Prime TRI task order issued under it.

9

the merits of the underlying litigation, (2) whether irreparable harm is likely if the injunction is not granted, (3) the balance of hardships as between the litigants, and (4) factors of the public interest." *Safeguard Base Operations, LLC*, 140 Fed. Cl. at 686 (citing *Trebro Mfg., Inc. v. Firefly Equipment, LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014)). While "[n]o single factor is determinative," *Contracting Consulting Eng'g LLC v. United States*, 103 Fed. Cl. 706, 709 (2012), "a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). The absence of one factor alone may be sufficient to deny preliminary injunctive relief. *See Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990). The court addresses each factor in turn.

### A.   Success on the merits.

Tribal Health has not established a likelihood of success on the merits for Count III, its claim that IHS's award of the bridge task order to Prime TRI "amounts to a continuing violation of the CICA stay." ECF No. 20 at 9.

The dispute here originated with Solicitation No. 75H70624R00001, under which Tribal Health and Prime Physicians hold IDIQ contracts to provide emergency department management and staffing services to rural hospitals in the Great Plains Area. ECF No. 1 ¶¶ 4, 18, 29. After Tribal Health's task order expired on September 30, 2025, IHS awarded the protested task order to Prime Physicians on a sole source basis. *Id.* ¶¶ 18, 19, 34, Ex. C at 5. Tribal Health protested this award at the GAO on August 8, 2025, thus triggering CICA's automatic stay. *Id.* ¶ 20. IHS ultimately issued a stop work order for Prime Physicians' task order and awarded the bridge task order to Prime TRI under a separate, amended IDIQ contract. *Id.* ¶ 69.

The threshold issue is whether performance under the bridge task order (in green in the chart above) equates to performance of the protested task order (in red), thus amounting to a de facto override of the CICA stay in violation of 31 U.S.C. § 3553(d)(3). CICA generally prohibits contract "performance and related activities" while a protest is pending at the GAO. *Id.* One purpose of CICA's automatic stay provision is "preserve the *status quo* during the pendency of the protest so that an agency would not cavalierly disregard the GAO's recommendation to cancel the challenged award." *Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 30-31 (2006). Another is to ensure that "vendors wrongfully excluded from Federal contracts would receive fair relief." *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 710 n. 8 (2008). The automatic stay serves as a guarantee that plaintiffs will not be prejudiced by protests pending before the GAO. *See Access Sys., Inc.*, 84 Fed. Cl. at 242.

In *Access Systems*, Judge Bruggink analyzed CICA's automatic stay provision in the context of a de facto override challenge to an agency's bridge contract award. *Id.* The court framed the issue as follows: "the relevant question is whether the bridge contract *shares the same character or function as a formal override* and, thus, whether the bridge contract *could prejudice [the] plaintiff* in its protest before the GAO or in subsequently performing the work if it is successful in its protest." *Id.* at 243 (emphasis added). He then looked to the "character or function" of the bridge contract at issue and concluded that it did not amount to a functional equivalent of a CICA Override. *Id.* This was because (1) the bridge contract lasted only during

10

the pendency of the GAO protest, (2) the bridge contract was funded through separate appropriations, (3) the appropriated funds for the original contract remained untouched, and (4) the bridge contract's 120-day term was independent of the term of the original contract. *Id.* In other words, the bridge contract did not lessen the amount of work under the original contract nor the amount of funds to pay for that work. Despite the original contract and bridge contract providing for identical services, the latter was nonetheless "a new contract with a distinct character and function"; therefore, "[t]he status quo with respect to the original contract remain[ed] unchanged." *Id.*

Given *Access Systems*, Tribal Health is unlikely to succeed on the merits of its de facto override claim. Based on the limited record before the court, the bridge task order does not appear to "share[] the same character or function as a formal override," and thus potentially "prejudice the plaintiff" while its GAO protest plays out or in subsequently performing the work. As in *Access Systems*, the bridge task order's duration is limited—a forty-day base period with two thirty-day option periods. ECF No. 37-1 at Appx 49-50. And IHS is paying for the bridge task order with advance appropriations for FY2026, while the protested task order remains funded through FY2025 funds. ECF No. 37-1 ¶ 4. To be clear, "[n]o funds have been de-obligated from TO-3006," which is the protested task order. *Id.* In other words, if Tribal Health prevails at the GAO, the protested task order will still be there for it to perform.

The court acknowledges that, unlike the bridge contract in *Access Systems*, the protested task order here has a set end date—June 30, 2026, when IHS intends to procure the emergency department staffing through new task orders issued under new IDIQ contracts. As a result, the period of performance of the protested task order is shrinking during the protest at GAO. But this is not prejudice caused by the performance of the Prime TRI task order. As Judge Bruggink explained, the underlying issue in de facto override challenges is whether the *bridge contract* may prejudice the plaintiff if it succeeds in its protest and seeks to perform the work. *Access Sys., Inc.*, 84 Fed. Cl. at 242. Here, the potential for shortened performance is a consequence of IHS's fixed end date resulting from its desire to move to different contract vehicles, not the performance of the bridge work. In other words, if there were no bridge contract at all, the period of performance would still be shrinking to exactly the same degree. Thus, the court concludes that the Prime TRI task order does not share the same character as a CICA Override.

Much of Tribal Health's argument centers on the allegation that Prime TRI is a "joint venture owned and potentially controlled by Prime Physicians." ECF No. 27 at 6. Tribal Health warns that "[t]o permit an agency to circumvent the stay in such a blatant manner would render CICA's stay provisions toothless." *Id.* But Tribal Health fundamentally misunderstands the purpose of the CICA stay. The automatic stay provision preserves the status quo with respect to the *contract*, not a contractor's status as the incumbent. *SVD Stars II v. United States*, 138 Fed. Cl. 483, 487-88 (2018). Indeed, the incumbent has no right to receive a bridge contract. If it were otherwise, unsuccessful incumbents could guarantee they received bridge contracts simply by filing a protest at the GAO. That is plainly not the law. *See id.* at 487 ("[T]he gravamen of [the incumbent's] position appears to be that if an agency awards a bridge contract during a GAO protest, the status quo may only be preserved by awarding the bridge contract to the incumbent . . . . The CICA stay, however, is not intended to freeze an incumbent's status while GAO processes a protest."). It should thus come as no surprise that *Access Systems* and *SVD Stars* rejected the plaintiff's de facto override claim despite the agency awarding the bridge contract to

11

the *same* contractor that received the protested contract. *See generally Access Sys.*, 84 Fed. Cl. at 241; *see also SVD Stars II*, 138 Fed. Cl. at 483. Because CICA would permit the agency to award the bridge task order directly to Prime Physicians, CICA surely permits the agency to award it to Prime TRI.

Finally, when asked, the Government disclaimed any argument that performance by Prime TRI during the GAO protest would justify IHS declining to follow the GAO decision because of the time, effort, or expense of transitioning to Tribal Health if it prevails. As the Government made clear, it must transition at the end of the bridge task order no matter what happens with Tribal Health's GAO protest because the bridge only allows for 100 days' performance and Prime TRI has no other means of performing after that. Thus, depending on the outcome of the GAO protest, the Government will either transition the Rosebud work to Prime Physicians or to Tribal Health—not continue with Prime TRI.

In the end, Tribal Health has not carried its burden at this stage to show that it is likely to succeed on its claim that the bridge task order constitutes a de facto override of the CICA stay. This factor weighs against injunctive relief.

### B.     Irreparable harm.

When considering irreparable harm, the court looks to whether the movant has "an adequate remedy in the absence of an injunction." *GEO Grp., Inc. v. United States*, 100 Fed. Cl. 223, 228 (2011) (citing *Magellan Corp. v. United States,* 27 Fed. Cl. 446, 447 (1993)); *see Reilly's Wholesale Produce,* 73 Fed. Cl. at 717). At this preliminary injunction stage, the focus is on whether Tribal Health "will suffer irreparable harm before a decision can be rendered on the merits" of *this* case. *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001).

Tribal Health has not established that it will suffer irreparable harm absent the court enjoining IHS from proceeding with the bridge task order. Tribal Health asserts that it faces irreparable harm in the form of "loss of incumbency advantages, erosion of relationships with contract staff and Rosebud Hospital officials, displacement from performance and increased efforts necessary to redeploy, and the inability to restore a level competitive field." ECF No. 27 at 7. In its view, each day of performance under the bridge task order "confers an entrenched, unfair competitive advantage on Tribal Health's competitor." *Id.* The court is not persuaded. While these harms may be significant, "[n]o federal contractor has a right to maintain its incumbency in perpetuity." *CRAssociates*, *Inc. v. United States*, 103 Fed. Cl. 23, 26 (2012). And the harms alleged by Tribal Health are common to any incumbent that experiences the loss of a successor contract. *See, e.g.*, *SVD Stars II*, 138 Fed. Cl. at 487-88; *CRAssociates,* 103 Fed. Cl. at 26; *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004).

This factor thus weighs against injunctive relief.

### C.     Remaining factors.

The court finds that both the balance of harms and public interest weigh against injunctive relief. The court's primary concern here is the public and IHS's interest in making sure that the people who need care in the Rosebud's emergency department get that care. As Tribal Health asserts, any interruption in the services at issue—emergency department

management and staffing—could have catastrophic consequences for an already underserved population.  ECF No. 1 ¶ 4.  Indeed, a disruption in services caused by an order halting performance "could result in closing the emergency department forcing patients to be diverted to other emergency healthcare facilities located more than 100 miles away." *Id*.  IHS agrees.  ECF No. 1, Ex. C at 2-3 (discussing all the potential harms from disrupting service a Rosebud's emergency department).  Any harm that Tribal Health may face from losing its incumbent status pales in comparison to IHS's and the public's interest in ensuring prompt access to healthcare.  These remaining factors weigh against injunctive relief.

Because the injunctive relief factors weigh against granting relief in this case, the court denies Tribal Health's motion for preliminary injunction.

## V.     Conclusion

For these reasons, the court:

1. Denies Tribal Health's motion for preliminary injunctive relief, ECF No. 20, and its supplemental motion for a preliminary injunctive relief, ECF No. 27;

2. Grants-in-part the Government's motion to dismiss, ECF No. 31, insofar as it seeks to dismiss Counts I and II, and denies it insofar as it seeks to dismiss Count III; and

3. Grants-in-part Prime Physicians' motion to dismiss, ECF No. 32, insofar as it seeks to dismiss Counts I and II, and denies it insofar as it seeks to dismiss Count III.

The court will separately schedule a conference to discuss further proceedings in this case.

It is so ORDERED.

s/ Edward H. Meyers  
Edward H. Meyers  
Judge